**T. Garry BUCKLEY, Janette M. Berry, James E. Fitzpatrick, Plaintiffs,**

**v.**

**Philip H. HOFF, Governor of Vermont, Harry H. Cooley, As Successor to Howard E. Armstrong, Secretary of State of the State of Vermont, Samuel A. Parsons, as Town Clerk of the Town of Hubbardton, Virginia L'Eucyer, as County Clerk for the County of Grand Isle, Defendants.**

Civ. A. No. 3653.

United States District Court
D. Vermont.

June 24, 1965.

A. Luke Crispe, Brattleboro, Vt., Richard H. Thomas, III, Burlington, Vt., for plaintiffs.

Chester S. Ketcham, Deputy Atty. Gen., for defendants Hoff and Cooley.

Hilton A. Wick, Burlington, Vt., for defendant Parsons.

Before WATERMAN, SMITH and ANDERSON, Circuit Judges.

WATERMAN, Circuit Judge:

Defendants Hoff and Cooley moved for an order declaring that the preferred plans enacted by the Vermont General Assembly to provide for reapportionment of the State Senate and State House of Representatives, Acts of 1965, Nos. 96, 97, and 98, comply with a portion of our order of August 3, 1964, as modified and affirmed by the United States Supreme Court on January 12, 1965. At the close of a hearing on June 24, 1965 we granted the motion in full, promising that this formal opinion would be filed shortly, and we reserved jurisdiction of the case as to other portions of the Supreme Court order not yet effectuated.

The current phase of this litigation began with our decision in Buckley v. Hoff, 234 F.Supp. 191, 197–198 (D.Vt. 1964), in which we ruled that the composition of the Vermont House of Representatives violated the Equal Protection Clause of the United States Constitution because "citizens of the state's larger communities are invidiously discriminated against," and that the composition of the Vermont Senate violated the same constitutional provision inasmuch as separate "representation of the two counties of Grand Isle and Essex causes the inhabitants of the 12 other counties to be invidiously under-represented."

We issued a decree, dated August 3, 1964, Buckley v. Hoff, supra at 200–201, which was subsequently modified and affirmed by the Supreme Court on January 12, 1965, pursuant to stipulation of all

the parties, Parsons v. Buckley, 379 U.S. 359, 85 S.Ct. 503, 13 L.Ed.2d 352. Insofar as is pertinent, the modified order required the Vermont General Assembly to reapportion or redistrict the State Senate and the State House of Representatives by July 1, 1965, so that a General Assembly composed in compliance with the Equal Protection Clause of the United States Constitution could be elected to govern the State of Vermont in 1966. We adopted this modified order as our own on January 27, 1965.

In a conscientious attempt to comply with our order, the General Assembly has enacted three statutes which provide for reapportionment and redistricting of the Senate and the House of Representatives. Act No. 96, § 1 reapportions and redistricts a Senate of thirty members along county lines on the basis of total residents with multi-member districts, in the manner shown in Appendix A to this opinion. Act No. 97, § 3(c) prescribes future reapportionment of the Senate following each decennial census on the basis of census population figures with county lines in mind. In the event that we should declare the preferred plan to be unconstitutional, Act No. 96, §§ 2 and 3 provide alternative apportionment plans for the Senate, but as we have ruled that the preferred plan is constitutional we need not discuss the alternative plans.

Act No. 98, § 4 reapportions and redistricts a House of Representatives of 150 members along town lines on the basis of registered voters with multi-member districts, in the manner shown in Appendix B to this opinion. Act No. 98, §§ 5 and 6 provide, for the further subdistricting of multi-member districts in the House of Representatives into single-member and two-member districts. Act No. 97, §§ 3(a) and 3(b) prescribe future reapportionment and redistricting of the House of Representatives following each second presidential election after 1964 on the basis of registered voters, with no district to deviate in size by more than 15% from the average size for the entire House. In the

event that we should declare the preferred plan to be unconstitutional, Act No. 97, § 10 provides an alternative apportionment plan for the House of Representatives, but as we have ruled that the preferred plan is constitutional we need not discuss the alternative plan.

We hold that the Equal Protection Clause permits the use either of total residents as under Act No. 97, § 3 (c), or of registered voters as under Act No. 97, § 3(a), as a base for apportionment of the Senate and the House of Representatives. In Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and four companion decisions, the Supreme Court reviewed apportionment plans which were based on total residents, and nowhere was it intimated that the five plans were for that reason unconstitutional. Cf. WMCA, Inc. v. Lomenzo, 238 F.Supp. 916, 925 (SDNY 1965). As for the use of a registered voter base, it is entirely consistent with Reynolds v. Sims, supra, 377 U.S. at 554–568, 84 S.Ct. 1362, in which the Supreme Court repeatedly discussed the Equal Protection Clause in terms of equality of voting rights among qualified citizens.

Nor need we rely only on inferences. In Reynolds v. Sims, supra, 377 U.S. at 577, 84 S.Ct. at 1390, the Supreme Court explicitly stated:

"[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable. We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of *residents, or citizens, or voters.* Mathematical exactness or precision is hardly a workable constitutional requirement." (Emphasis supplied).

We interpret this statement as a general endorsement of the use of either "residents" or "voters" as a base for legislative apportionment. Cf. WMCA, Inc. v. Lomenzo, supra, 238 F.Supp. at 925.

■ To be sure, in particular cases the selection of total residents or registered voters may violate the Equal Protection Clause, if it evidences an attempt to perpetuate prior malapportionment. Cf. WMCA, Inc. v. Lomenzo, supra at 924–925. In Vermont, however, a malapportioned body has not switched from one apportionment base to another, thereby arousing a suspicion of discriminatory motives on the part of the present General Assembly. The use of total residents as a base for apportionment of the Senate is merely a continuation of an historic state policy, and the House of Representatives has never before been apportioned on the basis of any popular figure whatever. Compare WMCA, Inc. v. Lomenzo, supra at 924.

■ Moreover, there is no evidence that the selection of registered voters as a base for apportionment of the House of Representatives has the effect of perpetuating existing discrimination against "citizens of the state's larger communities." Buckley v. Hoff, supra, 234 F. Supp. at 197. When we compare the consequences of using a base of registered voters as against a base of total residents, we note that Burlington-Winooski's share of the total apportionment base only drops from 11.0% to 10.0%, and that the combined share of the next three largest communities, Rutland, Bennington, and Brattleboro, jumps from 11.0% to 12.2%, excluding adjacent towns with which they are districted, and from 11.7% to 13.0% when the adjacent towns are added. The ten largest cities and towns in the state, those already named and Springfield, Barre, St. Albans, Montpelier, St. Johnsbury, and South Burlington, when taken together, also show a gain when registered voters rather than total residents are used, for their share of the total apportionment base increases from 35.8% to 36.0%, excluding adjacent towns with which they are districted, and from 37.7% to 37.9% when the adjacent towns are added. We find here no "ghost of prior malapportionment." Compare WMCA, Inc. v. Lomenzo, supra, 238 F. Supp. at 924.

■ It is often argued that the Supreme Court must ultimately condemn the registered voter base in general because of its potential abuse in areas of the country where people are still systematically deprived of the right to vote. This argument overlooks the possibility that different rules may apply in different parts of the nation. As the Supreme Court remarked in Reynolds v. Sims, supra 377 U.S. at 578, 84 S.Ct. at 1390: "What is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case." In Vermont there is no evidence that anyone has been unjustly denied the franchise in elections to the General Assembly. On the contrary, we note that the 209,225 registered voters constitute 53.7% of the 389,895 residents of the state. Surely this fact demonstrates that registered voters can properly be used as a representative base for legislative apportionment in Vermont.

■ We also find that the plans enacted by the General Assembly comply with "the basic standard of equality among voters in the apportionment of seats in state legislatures." Reynolds v. Sims, supra at 561, 84 S.Ct. at 1381. Under Act No. 98, § 4, the disparity in registered voters per representative between the largest and smallest districts in the House of Representatives is 1.30:1, and the minimum percentage of registered voters represented by a majority of the House is 48.7%. Under Act No. 97, § 3(b) (2), the maximum potential disparity in registered voters per representative between the largest and smallest districts in any future House of Representatives will be 1.35:1. These figures are well within the disparity ratio of 1.7:1 and the minimum percentage of 45.1% in the Colorado House of Representatives, which the Supreme Court indicated was "at least arguably apportioned substantially on a population basis" Lucas v. Forty-Fourth Gen. Assembly, 377 U.S. 713, 730, 84 S.Ct. 1459, 1470, 12 L.Ed.2d 632 (1964).

Moreover, the General Assembly has eliminated the invidious discrimination against "citizens of the state's larger communities" which caused us to hold, in Buckley v. Hoff, supra, 234 F.Supp. at 197, that "the House of Representatives is grossly malapportioned." Calculating from a base of registered voters, Burlington-Winooski is very slightly over-represented under Act No. 98, § 4, as are each of the next three largest communities, Rutland, Bennington, and Brattleboro, plus adjacent towns with which they are districted. The ten largest cities and towns in the state already named, plus adjacent towns with which they are districted, when taken together also show a very slight degree of over-representation.

As for the Senate, the General Assembly has eliminated the disparity in favor of "the two counties of Grand Isle and Essex" which caused us to hold, in Buckley v. Hoff, supra at 197–198, that the upper house was also malapportioned. Under Act No. 96, § 1, Grand Isle is combined with Chittenden County, and Essex is combined with Orleans County, in such a way as to give the residents of Grand Isle and Essex virtually the exact representation in the Senate to which they are entitled under the Equal Protection Clause.

The only troublesome feature under Act No. 96, § 1 is the disparity in residents per senator of 1.60:1 between Orange County and Addison County, the largest and smallest electoral districts in the Senate.[1] However, overall representation in the Senate is quite fair, for the minimum percentage of residents represented by a majority of the upper house is 48.8%. These figures are still a marked improvement over the disparity ratio of 1.7:1 and the minimum percentage of 45.1% in the Colorado House of Representatives, which the Supreme Court found to be "arguably" constitutional.

Moreover, this disparity in size between the largest and smallest districts is caused solely by the General Assembly's policy of preserving county boundaries in the Senate. Of such a policy the Supreme Court spoke as follows in Reynolds v. Sims, supra, 377 U.S. at 580–581, 84 S.Ct. at 1391:

"A consideration that appears to be of * * * substance in justifying some deviations from population-based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions. * * * [A] State may legitimately desire to construct districts along political subdivision lines to deter the possibilities of gerrymandering."

We also note that Addison County, which is by far the smallest electoral district in the Senate, is very slightly underrepresented in the House of Representatives, while Orange County, which is by far the largest district, is slightly overrepresented in the House. Regarding this happenstance the Supreme Court has stated: "[A]pportionment in one house could be arranged so as to balance off minor inequities in the representation of certain areas in the other house," Reynolds v. Sims, supra at 577, 84 S.Ct. at 1389; "the proper, and indeed indispensable, subject for judicial focus in a legislative apportionment controversy is the overall representation accorded to the State's voters, in both houses of a bicameral state legislature," Maryland Comm. for Fair Representation v. Tawes, 377 U.S. 656, 673, 84 S.Ct. 1429, 1439, 12 L.Ed.2d 595 (1964).

We do not mean to suggest that in the future, so long as county boundaries are preserved and the disparities are balanced to some degree in the House of Representatives, the General Assembly may apportion the Senate into districts more disparate in total residents than 1.60:1. As the Supreme Court wrote in

---

1. Excluding Orange County and Addison County, the disparity between the next largest and smallest districts in the Senate, Windham County and Lamoille County, is 1.35:1.

Reynolds v. Sims, supra, 377 U.S. at 581, 84 S.Ct. at 1392:

> "[I]f, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all of the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired."

We hold only that as of now the General Assembly has not exceeded constitutional limits.

■ All the parties apparently concede that multi-member districts, such as are established in the Senate and the House of Representatives by Act No. 96, § 1 and Act No. 98, § 4, are clearly permissible under the Equal Protection Clause. We agree. In Reynolds v. Sims, supra at 579, 84 S.Ct. at 1390, the Supreme Court remarked that a state "might [legitimately] desire to achieve some flexibility by creating multimember or floterial districts," and in Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965) the Court expressly upheld against constitutional attack the general use of multi-member districts. To be sure, in particular cases multi-member districts may violate the Equal Protection Clause, if they are designed "to minimize or cancel out the voting strength of racial or political elements of the voting population," Fortson v. Dorsey, supra at 439, 85 S.Ct. at 501. In Vermont, however, they are attributable solely to the General Assembly's policy of preserving county boundaries in the Senate, and, to a limited extent, town boundaries in the House of Representatives.

All the parties apparently also concede that reapportionment of the Senate every ten years, as under Act No. 97, § 3 (c), and of the House of Representatives every eight years, as under Act No. 97, § 3(a), is in full accord with the Equal Protection Clause. We again agree. The Supreme Court wrote in Reynolds v. Sims, supra 377 U.S. at 583–584, 84 S. Ct. at 1393:

> "While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation. And we do not mean to intimate that more frequent reapportionment would not be constitutionally permissible or practicably desirable."

Concerning the number of legislators in the Senate and the House of Representatives, we have nothing whatever to say. As the Supreme Court stated in Reynolds v. Sims, supra at 581, n. 63, 84 S.Ct. at 1392:

> "Determining the size of its legislative bodies is of course a matter within the discretion of each individual State. Nothing in this opinion should be read as indicating that there are any federal constitutional maximums or minimums on the size of state legislative bodies."

Accordingly, we find no valid objection under the Equal Protection Clause of the United States Constitution to the preferred plans enacted by the Vermont General Assembly that provide for reapportionment and redistricting of the State Senate and State House of Representatives, Acts of 1965, Nos. 96, 97, and 98. Furthermore, we take this opportunity to repeat what was said in Buckley v. Hoff, supra, 234 F.Supp. at 198:

> "[W]e are very conscious of the well-known law abiding characteristics of the independent people of Vermont, and of the justified reputation that the State and its people enjoy for integrity, responsibility, and fairness when a course of action is required to be followed."

Our confidence in the people of Vermont, and our faith that their elected representatives would reapportion and redistrict the General Assembly to meet constitutional requirements have been fully vindicated.

## APPENDIX A

### Senate

| Counties | 1960 Residents | Senators | Residents Per Senator |
|---|---|---|---|
| Addison | 20,076 | 2 | 10,038 |
| Bennington | 25,088 | 2 | 12,544 |
| Caledonia | 22,786 | 2 | 11,393 |
| Chittenden-Grand Isle | 77,352 | 6 | 12,892 |
| Essex-Orleans | 26,226 | 2 | 13,113 |
| Franklin | 29,474 | 2 | 14,737 |
| Lamoille | 11,027 | 1 | 11,027 |
| Orange | 16,014 | 1 | 16,014 |
| Rutland | 46,719 | 4 | 11,680 |
| Washington | 42,860 | 3 | 14,287 |
| Windham | 29,790 | 2 | 14,895 |
| Windsor | 42,483 | 3 | 14,161 |
| Totals | 389,895 | 30 | 12,997 |

## APPENDIX B

### House

| Towns | 1964 Registered Voters | Representatives | Registered Voters Per Representative |
|---|---|---|---|
| Burlington and Winooski | 20,817 | 15 | 1,388 |
| Rutland City, Rutland Town, Mendon and Chittenden | 12,226 | 9 | 1,358 |
| Bennington and Woodford | 8,263 | 6 | 1,377 |
| Brattleboro | 6,831 | 5 | 1,366 |
| St. Albans City, St. Albans Town, Fairfield and Fairfax | 7,574 | 5 | 1,515 |
| Springfield and Baltimore | 5,657 | 4 | 1,414 |
| Barre City | 5,346 | 4 | 1,337 |
| Hartford, Norwich and Hartland | 5,214 | 4 | 1,304 |
| Montpelier | 4,457 | 3 | 1,486 |
| St. Johnsbury | 4,342 | 3 | 1,447 |
| South Burlington | 3,986 | 3 | 1,329 |
| Essex and Jericho | 4,260 | 3 | 1,420 |
| Rockingham, Westminster, Putney and Athens | 4,587 | 3 | 1,529 |
| Colchester, Milton, Georgia, South Hero and Westford | 4,077 | 3 | 1,359 |
| Middlebury, Weybridge and Ripton | 2,919 | 2 | 1,460 |
| Barre Town and Orange | 2,670 | 2 | 1,335 |
| Newport City and Newport Town | 2,843 | 2 | 1,422 |

## House

| Towns | 1964 Registered Voters | Representatives | Registered Voters Per Representative |
|---|---|---|---|
| Windsor, Reading and West Windsor | 2,853 | 2 | 1,427 |
| Swanton and Highgate | 2,826 | 2 | 1,413 |
| Morristown, Stowe and Elmore | 3,109 | 2 | 1,555 |
| Northfield, Berlin and Roxbury | 2,864 | 2 | 1,432 |
| Waterbury, Middlesex and Worcester | 2,508 | 2 | 1,254 |
| Randolph, Bethel and Braintree | 2,784 | 2 | 1,392 |
| Woodstock, Bridgewater, Pomfret, Barnard, Sherburne and Plymouth | 3,055 | 2 | 1,528 |
| Manchester, Dorset, Peru, Winhall and Landgrove | 2,764 | 2 | 1,382 |
| Lyndon, Burke, Sutton, Sheffield, Wheelock, Kirby, Newark and East Haven | 2,815 | 2 | 1,408 |
| Ludlow, Londonderry, Mt. Holly and Weston | 2,759 | 2 | 1,380 |
| Barton, Irasburg, Glover, Brownington, Coventry and Westmore | 2,845 | 2 | 1,423 |
| Brandon, Pittsford and Goshen | 2,781 | 2 | 1,391 |
| Shelburne, Williston, Charlotte and St. George | 2,743 | 2 | 1,372 |
| Vergennes, Ferrisburg, New Haven, Addison, Panton and Waltham | 2,891 | 2 | 1,446 |
| Pownal, Wilmington, Whitingham, Readsboro, Stamford, Dover and Searsburg | 3,072 | 2 | 1,536 |
| Wallingford, Clarendon, Danby, Shrewsbury, Middletown Springs, Ira, Tinmouth and Mt. Tabor | 2,820 | 2 | 1,410 |
| Bradford, Thetford, Fairlee, Strafford, West Fairlee and Vershire | 2,421 | 2 | 1,211 |
| Williamstown, Chelsea, Corinth, Topsham, Washington and Brookfield | 2,710 | 2 | 1,355 |
| Cambridge, Johnson, Hyde Park, Eden, Fletcher, Waterville and Belvidere | 2,758 | 2 | 1,379 |
| Poultney | 1,510 | 1 | 1,510 |
| Fair Haven | 1,477 | 1 | 1,477 |
| West Rutland | 1,314 | 1 | 1,314 |
| Hardwick and Walden | 1,465 | 1 | 1,465 |
| Proctor | 1,270 | 1 | 1,270 |
| Shaftsbury | 1,267 | 1 | 1,267 |
| Bristol and Lincoln | 1,554 | 1 | 1,554 |

## House

| Towns | 1964 Registered Voters | Representatives | Registered Voters Per Representative |
|---|---|---|---|
| Chester and Andover | 1,363 | 1 | 1,363 |
| Richford and Montgomery | 1,555 | 1 | 1,555 |
| Derby, Holland and Morgan | 1,461 | 1 | 1,461 |
| Castleton, Sudbury and Hubbardton | 1,412 | 1 | 1,412 |
| Enosburg and Bakersfield | 1,405 | 1 | 1,405 |
| Arlington, Sunderland and Sandgate | 1,381 | 1 | 1,381 |
| Brighton, Charleston and Norton | 1,358 | 1 | 1,358 |
| Royalton, Tunbridge and Sharon | 1,536 | 1 | 1,536 |
| Newbury and Ryegate | 1,331 | 1 | 1,331 |
| Cavendish and Weathersfield | 1,504 | 1 | 1,504 |
| Troy, Lowell, Westfield and Jay | 1,262 | 1 | 1,262 |
| Danville, Groton and Peacham | 1,402 | 1 | 1,402 |
| Barnet, Concord and Waterford | 1,485 | 1 | 1,485 |
| Pawlet, Rupert and Wells | 1,302 | 1 | 1,302 |
| Richmond, Underhill, Huntington and Bolton | 1,492 | 1 | 1,492 |
| Dummerston, Newfane and Brookline | 1,241 | 1 | 1,241 |
| East Montpelier, Calais and Woodbury | 1,260 | 1 | 1,260 |
| Hinesburg, Starksboro and Monkton | 1,196 | 1 | 1,196 |
| Alburg, Grand Isle, North Hero and Isle La Motte | 1,379 | 1 | 1,379 |
| Lunenburg, Canaan, Bloomfield, Guildhall, Lemington, Brunswick, Maidstone, Granby and Victory | 1,460 | 1 | 1,460 |
| Sheldon, Franklin and Berkshire | 1,404 | 1 | 1,404 |
| Rochester, Stockbridge, Hancock, Pittsfield and Granville | 1,213 | 1 | 1,213 |
| Guilford, Vernon, Marlboro and Halifax | 1,406 | 1 | 1,406 |
| Marshfield, Plainfield and Cabot | 1,393 | 1 | 1,393 |
| Orwell, Shoreham, Benson, Whiting and West Haven | 1,366 | 1 | 1,366 |
| Moretown, Waitsfield, Duxbury, Warren and Fayston | 1,399 | 1 | 1,399 |
| Cornwall, Bridport, Salisbury and Leicester | 1,259 | 1 | 1,259 |
| Craftsbury, Greensboro, Albany, Wolcott and Stannard | 1,365 | 1 | 1,365 |
| Townshend, Jamaica, Grafton, Wardsboro, Windham and Stratton | 1,331 | 1 | 1,331 |
| Totals | 209,225 | 150 | 1,395 |